I'm here this morning on behalf of the appellant AIC, that is, Accident Insurance Company. AIC did not receive from US Bank what it bargained for in the trust agreement. The safe, negotiable bonds AIC counted on as collateral for its reinsurance program were exited from the account, and an unqualified asset known as Destra was added instead. In a few limited but critical circumstances, US Bank was the gatekeeper here. The bank assumed an unambiguous contractual duty to determine whether Destra could be transferred without third-party involvement. The overwhelming evidence at trial, presented by both parties, demonstrated that Destra could not be. In finding no breach, the district court erred as a matter of law by misapplying several key Delaware contract rules. The district court did not find the trust agreement to be ambiguous, yet looked past its plain language and relied instead on US Bank's expert testimony. In fact, the district court accepted the expert's word, even when it was in contrast to the accepted shared explanation of a fee term by both parties. US Bank's breaches also extended to their false account statements and their inaction when AIC attempted to withdraw the Destra from their account. In some corners, the district court's ruling violated governing law, stands at odds with the preponderance of evidence that was before it, and should be reversed with a remand to consider AIC's substantial financial losses. I'd like to first turn to the violation of trust agreement section 8B. That provision required in undisputed terms that before accepting any asset for deposit, US Bank shall determine that the asset is in a form that US Bank can negotiate it without the consent of a third party. The evidence presented at trial showed overwhelmingly that the Destra units lacked that required form. The Destra units were subject to strict restrictions, as was evidenced at trial. For example, the Destra master trust agreement clearly indicated that a third party administrative agency services had sole discretion over transfer of these two units. In fact, US Bank admits in their brief that AAS had substantive discretion over unit transfers. And the district court found that at the time they acted, US Bank was aware of these transfer restrictions. As further evidence that Destra did not meet the requirements, when AIC attempted to withdraw these Destra in July of 2014, they were unable to do so in part because, as US Bank explained to them, they couldn't complete the transfer and AAS was the reason why. The evidence at trial further showed, Your Honors, that US Bank did not perform the determination that section 8B required them to perform. The key evidence here is the testimony of Mr. Robert Ruby, who was the account manager for US Bank, for the trust account for US Bank, at the time that the Destra entered the trust account. He also, from US Bank's perspective, is, quote, unquote, the point person for these transactions. It was his keystrokes that were responsible for bringing the Destra into the account, and he testified at trial on page 744 and 45 of the joint appendix. At the time he entered those keystrokes, at the time that the Destra entered the trust account, he had not and did not perform the determination that section 8B requires. In applying section 8B, are you asking us to make a distinction between what US Bank was required to determine as to negotiability of the security, as opposed to determining the type of security that qualifies as eligible? As I understand the question, the determination under 8B is for them to determine whether it's in a negotiable form. Now, whether that's different than the negotiability, I think US Bank has tried to make a distinction there, but their own witness basically testified, and this is, again, Mr. Frank Bradley, page 628 and 702 of the record, that their duty was to determine whether it was negotiable. And so that was the duty that section 8B required. Negotiable form and negotiability really are indistinguishable, at least as the parties understood that term to mean at the time that they acted. And so that was their duty under section 8B. And so the district court's ruling misinterpreted 8B in two respects, both in defining what the duty entailed and in defining what US Bank must do if a proposed asset failed to meet the requirements of section 8B. And so the district court's order actually found that negotiable really depended on the type of asset. And if it were a book entry form, then negotiable really just means registered. Now, that is inconsistent with Delaware contract law in one key respect. Delaware contract law requires that the fundamental rule of contract interpretation is that undefined contract terms are given their plain, ordinary meaning. The plain, ordinary meaning of negotiable under Delaware case law, under its iteration of the Uniform Commercial Code, even looking at Black's Law Dictionary, it means transferable by delivery. And so here under section 8B, really the rule was they had a duty to determine whether a district could be transferred by delivery without third-party consent. And as the evidence we think clearly demonstrates, they didn't either perform that duty and the district units did not comply with that obligation. The second way in which the district court erred in interpreting section 8B was in finding that if they completed this determination and the asset did not conform, the district court held that US Bank had no duty to perform any additional act. Believe that it also violates Delaware contract rules. The fundamental rule of contract law here would be that the interpretation of contract should be based on the intent of the parties. On this particular point, the parties agree as to what that section of 8B means. The 8B starts by saying before accepting any asset, that word accept there means that you accept it with, or excuse me, you obtain it with approval. And in fact, if you look at what the parties who signed the contract testified at trial, Michael Hunter, who is AIC's CFO, he testified on page 967 of the record that what 8B meant is that US Bank would only admit an asset if it met the 8B requirement. Also, Frank Bradley, who was the USB account manager, relationship manager, excuse me, who signed the contract on US Bank's account, he testified on page 707 to 708 of the record that US Bank certainly could have refused to accept or refused to admit an asset if it failed to meet the 8B form. And so for the district court to find that there was no additional requirements if the determination found that the asset was nonconforming,  is also at odds with the plain, ordinary meaning of the word accept. I cited the Warden case, which is the Fourth Circuit case, defining the word accept, which means to not just receive it passively, but to receive with approval. In fact, the Warden case actually said that by using the word accept, it connotes the ability to decline to accept as well. Does it affect your argument that a separate provision of the agreement, paragraph 2B, didn't have this requirement of determination occurring before acceptance of the asset for deposit? How does that, if at all, affect your argument? I don't think, Your Honor, that it retracts from the argument at all, because the key part of 2B is that the determination there is required. And I think if you're looking at those two… Right, but it doesn't say anything about that being, you know, acceptance being a condition or requirement of that determination. And I get your point. 8B is much more specific, and maybe that's the answer. It's an additional requirement that appears elsewhere in the agreement. Yes, Your Honor. And, again, going back to contract canon, that specific provisions would prevail over general ones. And so 8B being more specific, that would be a reason to find that that would prevail over any perceived inconsistency there. Your Honor, as opposed to following the plain, ordinary meaning of accept and failing to apply the party's understanding of accept, the district court instead followed the U.S. Bank's expert opinion from Mr. Christopher Hillcote. We believe that to be an error of law for a couple of reasons. First of all, the district court did not find the contract to be ambiguous, but still went to extrinsic evidence. That, too, violates the provision of Delaware contract law, which basically says that if a contract is unambiguous, you cannot turn to extrinsic evidence like industry custom and those sorts of things. Was there an objection to the testimony? Not to its admission, but we did object to how it was actually used here. If you look at the closing argument by Ms. Campbell, and I can point you to the specific page where she said this. It's page 1588, I believe, of the Joint Appendix. She said that the plain language of the contract clearly has to prevail over industry's standard testimony from an expert. So it was objected to how it was being used or how the court might use it or ultimately use it. It was, again, raised in our post-trial motions. That's on page 401 of the record. We objected to the way in which the district court used Mr. Hillcote's testimony.  I believe this being both a contract and a tort case, even if it's not admissible on the contract, it could be admissible on the tort. And, really, this is how the court used it that we're objecting to, not the fact that it was admitted, because had the court found an ambiguity, then it could have been possible to use this testimony. We think it's flawed anyway, but it would have been able to use the testimony if the court had found an ambiguity. There are a couple of other additional issues with Mr. Hillcote's testimony. It also violates the Delaware contract rule that when there is a merger or full integration provision, the court may not turn to extrinsic evidence. Here in paragraph 16, there is a full integration provision, which specifically says that there are to be no understandings of the contract provisions, except those which are stated in the contract itself. They are offering, U.S. Bank offers for Mr. Hillcote, an understanding that was outside of its plain language. And as the Delaware Supreme Court has held in the J.A. Moore case, when parties, sophisticated parties like an insurance company and a bank, put a full integration provision in their contract, that is clear evidence that they intended to exclude extrinsic evidence from trial. Also note from Mr. Hillcote's testimony or his report, he admitted that his opinions were not to be used to interpret specific provisions of the contract. And, Your Honor, I don't believe him to be in a position to offer any perspective on how AIC viewed this provision of the contract, seeing as how he also said in his report he was not qualified to offer any sort of perspective on how the insurance industry operated. And for those reasons, Your Honor, we think the district court erred in relying on Mr. Hillcote's testimony. I would also note this. Mr. Hillcote testified that all U.S. Bank had to do under 8B was just look at the registration statement. And if the registration statement indicated that U.S. Bank was the sole registered owner of the units, that's all they were required to do. But what the testimony at trial showed is that even if they had performed that particular determination, which Mr. Ruby said they didn't, that there would be nothing on the face of those registration, of those investment orders that would show any reasonable trustee that no third party would have to be involved in transfer. That was Mr. Hillcote's testimony on page 1392 and 93 of the joint appendix. So even if the district court were to accept Mr. Hillcote's testimony as to what the duty required, the evidence still demonstrated that U.S. Bank did not perform that duty, excuse me, that determination before these tests were entered into the account. So the district court in this case didn't actually make that determination because under your view of things, it incorrectly defined negotiability or negotiate. So should we send it back, this report, to make the correct determination? Or do you think there's enough evidence in this record for us to do that? I think there's enough evidence in this record to rule or to reverse on the breach element here because there is plenty of evidence as to what the plain meaning of what AB actually meant in terms of what negotiate meant and in terms of what the effect of the word except on the section AB duty. And so there's evidence in terms of the plain meaning and in the party's testimony that would be sufficient to allow the court to reverse on that. Now, as to the approximate cause and damages, we believe, Your Honor, that a remand would be required there because the court didn't actually reach either of those two issues. I do want to address in the bit I have left, I think what you might hear from Defendant for Imposing Counsel. They're going to say something along the lines that they have every right to rely on authorized signers, but that's under Section 8D, but that is not an absolute right. 8D starts by saying, unless otherwise provided. And so where that's inconsistent with the substantive duty that they are undertaking, then they're not allowed to simply rely on an authorized signer. Also, they might cite to you Section 2B, which indicates that they have no duty for asset qualification or character, but they express exception to that because what's later in 2B, which is also the same duty that's in Section 8B. And so, Your Honor, they might also cite that their duties were entirely administrative and non-discretionary, but our argument is not inconsistent with that in any respect. Their duty to make this determination as to whether a third-party control was required in order to transfer these units was non-discretionary. Discretionary just means there's no hard and fast rule. There was a hard and fast rule here. If it didn't meet that standard, then you don't accept it. If it does, then you did. And so, Your Honor, I suppose I might further un-reply to the tort elements, but I see my time is up. If there are no additional questions, I'll get it un-replied. All right. Thank you, sir. Let's hear from Mr. Krause. Thank you. Good afternoon. May it please the Court. My name is Michael Krause, and with me is my colleague, Malia Jefferson. Together, we were counsel for U.S. Bank in a six-day bench trial before Judge Child, and the trial court's judgment should be affirmed. The judgment was backed by comprehensive factual findings that accident does not contest on appeal. These findings, and also the legal conclusions, are critical to the court's determination of the two core issues that do remain unappealed. As the trial court found, an accident does not contest. U.S. Bank acted as a directed trustee. Its role was ministerial and custodial. It held assets that were selected by others and processed transactions at their direction. It had no investment discretion of the trust account, and U.S. Bank was to follow and rely on the instructions of accident's business partner. These are the parties that accident vested with investment authority, Dallas National and Dallas National's Investment Advisory. And as the trial court found, U.S. Bank acted in good faith in relying on instructions from accident's business partners. All those findings, in fact, are uncontested on appeal. It was not U.S. Bank's role to challenge or question their investment decision, but as the trial court found, that's really what this case is about. The investment decisions of accident's business partners. They are the ones who selected assets, specifically the Destre UIT, that did not qualify as eligible securities under the trust agreement. And as a result, the Destre UIT lacked the necessary value. And all of accident's damages flowed from this fact and none other. But as the trial court found, Mr. Krause, the fact that there may be other parties on the hook for any damages doesn't mean that your client isn't also on the hook. And I get your point about a directed trustee in the normal course of things having a limited role, but that, you know, that limitation can be expanded by contract. And your colleague's argument is that the agreement in this case imposed additional duties on the bank beyond those typically associated with, you know, the duties of a directed trustee, including an 8B. I mean, that language seems pretty, well, you tell me, what is it about 8B that your counsel on the other side has wrong in terms of imposing a condition of making a determination of acceptability of a particular asset? Certainly. Paragraphs 8B and 2B are entirely consistent with U.S. Bank's role as a directed trustee. That's not altered in any way. Where I think my colleague gets it wrong is in failing to recognize the significance of the focus on form. On what? I'm sorry, what did you say? Form. That U.S. Bank's examination under sections 8B and 2B is on the form of the asset. An accident gives some lip service to the word form in its brief and before this court, but form refers to the face or appearance of the asset, not its substance. And the focus on form reinforces U.S. Bank's role as a directed trustee. Where does form appear in the agreement? Your Honor, form appears in both sections 2B and 8B of the agreement. Okay. So the language in, for example, looking at 2B, that the trustee shall determine whether the assets are in such form that the beneficiary or the trustee may negotiate such assets without consent. And then the identical language in this respect appears in 8B, shall determine if the asset is in such form that it may be negotiated without consent. And that restricts, very consistent with the role of U.S. Bank's directed trustee, its review to the face of the document before it. What's the evidence that supports that interpretation of the word form? Well, the evidence, one, comes from just the use of the word form in the agreement. Is that defined? It is not a defined term in the agreement, but plain and ordinary usage of form is the face or appearance of something. And it appears again twice in both 2B and 8B. And then the evidence to the extent that then we're looking in terms of parties discussing what is it that trustees actually do, that comes both from, that comes from Chris Hilko, who discussed what trustees actually do under this precise regime. It comes from the testimony of Judy Stouderman, who testifies similarly about what it is that U.S. Bank does with respect to its review of assets coming into custody accounts and directed trust account. So there's ample evidence to support this factual finding. Because what the trial court did is make factual findings with respect to what it is that trustees actually do under this regime. As directed trustees who don't have responsibility to vet assets for their value, for their quality, don't have responsibility to go beneath the surface of the assets, review underlying documents. Those are all investment decisions made by others that U.S. Bank is bound to follow. I mean, you have to read the sort of read the rest of the sentence, right? I agree that it does have that the asset has to be in such form that we're talking about 8B. But then the rest of the sentence suggests an additional duty in such form that the trustee upon direction by the beneficiary can negotiate the asset without any further consent or signature from the grantor. So, I mean, what do we do with the rest of that? Your Honor, I think that all goes together. I don't think it's an additional duty. It's all the same duty. The responsibility under 2B and 8B is to make a determination that the asset is in such form that it can be negotiated without the consent of someone else. And so the question becomes, well, what does that mean? And there's the first way to look at it is, for one, is to look at obviously the language of the agreement itself. And when we're talking about the form of an asset and the form that can be negotiated without the consent of another, that refers to it being in a form where the trustee is the owner of the asset. The legal title is registered with the trustee. That's what Section 2B and 8B are getting at. And we know that, one, by the plain language of the document itself, because when we look at the definition of negotiate, for example, it has to do with the transfer of legal title. And we look at the insurance regulations. That accident relies on quite heavily, for example. The language of 2B and 8B come from the insurance regulations. We flagged this in our brief at page 28, I believe, that the insurance regulations, for example, make clear that legal title of an asset is to be registered in the name of the trustee, very plainly. And they actually tell you why. The reason that legal title must be registered in the name of the trustee is in order that the asset will then be transferable without the consent of someone else. And so it's very clear, even just from the face of the contract, that for an asset to be in negotiable form means that it must be in the name of the trustee, ownership in the trustee. And that's the responsibility that 2B and 8B bestow upon U.S. Bank to make a determination that an asset is in that form, that it is in the name of U.S. Bank as trustee or of the trust so that there shouldn't be a need to seek consent from someone else in order to transfer. That's it. And that's consistent with the role of U.S. Bank's directed trustee with its clerical and ministerial duties that don't go into substantive asset evaluation and don't go into any determination about whether a security is eligible, about the quality of the asset in any way. And that's exactly what happened here. And that's where we get to the factual finding that Judge Childs made, and that accident is tempting, I think, to overturn on appeal. Because Judge Childs then went ahead and made the factual finding, what is it that directed trustees do in order to make this determination about negotiable form, in order to make a determination based on the face of the ownership of the trustee? Mr. Calaway says, though, that, you know, the district court in this case made the mistake of relying on expert testimony and not on the ambiguous meaning of negotiating under Delaware common law. It does appear that she relied on the expert's view of what it meant to negotiate an asset. So why is that right when, in fact, well, negotiating is unambiguous? So let's start with that. Do you agree with that? I think either way, I think the district court guy are right. Obviously, if negotiate is unambiguous, then the district court looked to the testimony and report from Mr. Hillcoat in order to make factual findings about what it is that trustees actually do, and then to make a determination as to whether or not U.S. Bank acted in accordance with what trustees actually do in the real world to support a finding in this case of no breach of contract. I think that would be your factual finding. It's not using it to interpret the agreement. It's looking to establish the facts on the ground and to determine how U.S. Bank acted within those facts. Now, the district court also does note in the decision, Judge Childs noted that negotiate is not defined in the agreement, and therefore there is potentially a door open for extrinsic evidence. So either way, though, I think it's appropriate. Whether one wants to view it as an interpretation using Mr. Hillcoat's testimony to interpret the agreement, then negotiate is not defined in the agreement, and there was plenty of extrinsic evidence coming in at trial regarding the agreement. Mr. Callaway, for example, even in speaking to this court, cited any number of testimony about the interpretation of the agreement, how the parties saw the agreement. But we can set that aside, I think, because here, the trial court ultimately used Mr. Hillcoat's testimony as it was appropriate, which was to make factual findings about what it is that is actually done on the ground in the real world business of directing trustees with reinsurance programs. And that's what we had six days of testimony about and 13 live witnesses of individuals on the ground talking about what they do every day in terms of U.S. banks role in particular and contrasting them with the role of Dallas National and the role of Dallas National's Registered Investment Advisor. And that is the context in which the courts viewed all of the evidence in this case. And that's what makes it as well a factual and important factual finding. Was there testimony about the form, use the word form, of this agreement, that any testimony that this is a typical agreement, the language used here is not unusual? It wasn't. Yes, there was. This was the part of the, this language was, I believe in Mr. Hillcoat's report, whether he testified it or not, this report was made to evidence. This was, it was testimony from Mr. Bradley. This is a common provision. And in fact, one of the things I think we see both, even from the briefs that the language that is in both 2B and 8B mirrors almost word for word, the language of the Delaware insurance regulations that are part of the agreement. And then also even the Delaware insurance regulations, it's in the Delaware law of governance. So these, this language actually is very common. The record reflects that even the briefing or this court reflects that in terms of the insurance regulations. And that again is consistent with U.S. Banks, U.S. Banks limited role. With respect to Mr. Hillcoat, I think it is important to emphasize that he, his testimony was never objected to at any point during the trial. U.S. Bank, in fact, served his expert report on August 3rd, 2018, almost a year before trial before trial accident, actually stipulated the admission of Mr. Hillcoat's expert report into evidence without any redactions, without any exclusion. And at trial accident did not object to any of his testimony and moved to limit, strike it. And in fact, accident elicited its own testimony about this very same topic, the understanding and the application of 2B and 8B and what trustees do in the real world in front of judge Childs. So for accident to come now before this court and say, for the first time on reply that the reliance of use of Mr. Hillcoat's testimony was inappropriate is inconsistent with everything that occurred during, before the trial and during the trial. And again, the trial court appropriately used his testimony in order to understand what it is that the courts that to me that directed trustees do. And I do want to point out that there was, I think, a misstatement in terms of sort of how it was all positioned. The fact showed that the Mr. Hillcoat testified was that not that the journal book entry security has some sort of different application or different meaning as opposed to a paper, a certificated asset. But Mr. Hillcoat testified was that when a trustee in practice is looking to determine whether or not an asset is in negotiable form, whether or not the name of the asset is properly in the name of the trustee for purposes of ownership, what the trustee does on the ground differs as whether it's a paper book entry security or a certificated asset. So if a stock certificate, you look at the stock certificate, it has the name of the trust or the trustee on it, boom, it's in what's called negotiable form. Legal ownership is the name of the trustee. If you have a journal book entry security like the Duster UIT, there is no certificate. There's no piece of paper evidencing ownership. This report made factual findings about this aspect. Instead, what the trustee does is look at the trade instruction from the registered investment advisor, where you have a trade instruction from a registered investment advisor. That indicates to the trustee that the asset will be properly put in the trustee's name on the books and records of the transfer agent or the registrar that is keeping track of ownership. And that's exactly what U.S. Bank did. And when we look, for example, at this report's decision, I believe it's paragraph 58, this report makes the statement factual finding that is correct, that the Duster UIT entered the trust account based on the trade instruction from the registered investment advisor. And in doing so, the court cited not just the trade instruction itself, but the testimony of Rob Ruby, who four times testified to that fact. But that's how it came in, which is consistent with the role of the directed trustee who's earning $5,000 per year in performing his role compared to, for example, the $1.1 million that Accent received for allowing Dallas National to use its name in the insurance license. Vanessa, I asked your colleague this question about the difference in the language between paragraph 2B and 8B and whether or not that has any significance in this case, because it seems to me that 8B must mean something a little different than 2B in terms of the bank's obligations and duties. Does it? I don't know that it does, Your Honor. There's such a mirroring of the language in the two sections that if we were to read them to mean exactly the same thing, or for 8B to impose a greater duty than 2B, then it would, I think, render that section of 2B redundant and superfluous. What would 2B mean if 8B means something materially different? You could say the same about what would 8B mean if they mean the same thing. And that's why I think it's important to read them consistently. And in 2B, it makes it clear that the responsibilities determine whether or not the asset is in the form that it's negotiable without the consent of a third party. But regardless, even if the trustee is to make that determination before the asset enters the trust account, that doesn't change in the analysis because what's missing from both 2B and 8B is any responsibility, any obligation, any mandate to reject the asset if, for some reason, it's found not to be in the negotiable form. And that's critical because here we have an agreement that's under Delaware law, which very plainly says, courts are not to read into an agreement any implied or omitted terms. And the contract itself says that, that there should not be any implied terms read into the contract, no implied duties on U.S. Bank or any other party. And what's critical here even more so is that reading into the contract, this obligation to reject an asset if it's not in the, turns out not to be in the negotiable form, would directly contradict trial court's core findings with respect to U.S. Bank's role, that it's a directed trustee who follows orders and instructions of accidents business partners.  that would mandate that the trustee reject an asset, refuse to follow an instruction, would turn the trust agreement and the entire transaction structure on its head. It would compel U.S. Bank, that it would require U.S. Bank to refuse to follow trade instruction, even though it came from an authorized signer. It would compel U.S. Bank to veto the investment decision if the party was full investment authority. And if the party's intended to require U.S. Bank to take those steps and strip U.S. Bank of its right to rely on investment instructions, then the contract needed to say so expressly. You need to use those words to say, if the asset is not in the form specified under paragraphs 2B and 8B, U.S. Bank shall reject the asset and presumably return it to the investment advisor or grantor. Frankly, as it is, it's not clear what accident would have U.S. Bank do with the asset because the agreement doesn't say, does U.S. Bank keep the asset somewhere else? Does it return the asset? The point is that the trust agreement doesn't require any of these steps. The trust agreement requires U.S. Bank to make the termination, but it doesn't require any further action. And then U.S. Bank presented evidence as that's consistent with the trust agreement as to why that would be. That making a determination before the asset answers the trust account allows the trustee to determine if it needs to be re-registered, put the name in the proper, put the asset in the proper name, get U.S. Bank's name in as the trustee, and allows it to take those steps up front. And we have testimony both from Ms. Fowderman at trial and Mr. Hillcoat at trial in his report as to that being the industry custom practice. And more important, or just as important, it's consistent with U.S. Bank's role as a directed trustee, which is there to hold assets, to process transactions on instruction, to process those transactions in a high volume at a fast pace where the parties are counting on U.S. Bank to process them quickly and efficiently to take in the asset net and address any registration issue after the fact. And U.S. Bank was compensated accordingly at $5,000 per year, while Accident earned $1.1 million from Dallas National. I see that my time is coming up. The judgment should be affirmed in all respects following the six-day bench trial with 13 live witnesses, hundreds of exhibits into evidence, and the trial court's core findings regarding U.S. Bank's ministerial and clerical role in a much larger business transaction between Accident and Dallas National. Thank you, counsel. Mr. Krause, you've got some rebuttal time. Thank you, Your Honor. I just want to hit a few points. Your Honor, I believe that you are correct as to 8B, that there are two portions of the requirement there. There's determination as to negotiable form, and then regardless of the form or whether it meets whatever the definition of negotiable may be among the parties, is a third party's consent or signature required in order to transfer? That is the duty that they assumed by the plain language of the contract. I mean, your colleague on the other side says, look, we're a direct trustee. We get paid a mere pittance. He didn't say that, but $5,000 compared to the millions apparently the investment advisors are making. It's inconceivable that we would take on this kind of a liability. And if we would have, it should have been much more direct and express requirement to reject the asset. And that word doesn't appear anywhere in these documents. The word reject does not, but the word accept before accepting does. And what is the plain meaning of the word to accept? This court has said that the word accept means not just to receive it, but to receive with approval or sent. And the connotation of that term is that you have the right to reject it. What's more important about that is that, Your Honor, they have still not responded to Frank Bradley's trial testimony. He signed the contract for U.S. Bank, and he said they could have rejected it. They had an opportunity in their brief to respond to that. They didn't. They had an opportunity today to respond to that, and they didn't. There is a shared understanding of what accept means here. Both people who signed the contract says they could have kept them out. And now they want to come in today with an expert and say, no, they couldn't have. That's not how contract interpretation works under Delaware law. They still have not provided the court the bridge from how they get to Hillcote's testimony at all. They've still not demonstrated that extrinsic evidence should be used here to interpret the contract. Counsel, let me say this. These sorts of agreements between the umbrella insurance and the other party, I guess, DNIC, they take place. I mean, they're relatively common. And very often you get two parties like this. And what they do is they park the money or they park the assurity in a bank, and they don't intend to relinquish the investment authority to the bank. The bank is simply a conduit. And it's to process assets on instructions if the instructions are what they purport to be and are of a genuine form. But I can't see that. It seems to me you're trying to transform the bank's role into, if not an investment advisor, is to a much more active role than these two parties actually envision. This was just – when I look at the record as a whole and the contract as a whole, it seems to me what they were doing, they were just taking on a role that banks often take on, and that is a depository and make sure that transactions with regard to the assets are regular in their form. And it seemed to me this was ministerial, and this is what directed trustees do all the time, and that directed trustees are routinely empowered to do what the trustee was doing in this case. And the trustee actually said to AIC, go do such and such and such and such if you want the assets, but AIC never did that. And this would probably come as real news to the banking world to think that this sort of agreement for ministerial services led to this rather significant transformation of the bank's actual structure and the bank's actual duties. I don't seem – and I don't see it. I just worry that we're trying to make the bank into something that the parties did not envision. Your Honor, if I could respond. I see my time is up. May I respond to the question? You certainly may. I would respond by reference to Section 2B of the contract. And if you look at Section 2B, I agree in general terms that they didn't have an obligation generally as to access, qualification, and those sorts of things. But the exception is the remainder of 2B and which is the language of Section 8B. There is that exception that they wrote into the contract. And let's understand, this contract form came from U.S. Bank. And they included that exception, which includes not just negotiable form, but in negotiable form such that third-party consent or signature is not required. And so that's how they structured this agreement. Well, that's what you say. But the opposing counsel, I've listened carefully, indicated how these two sections could be harmonized perfectly. And Judge Diaz indicated some skepticism that the bank would take on this kind of role that would expose it to a really significant liability and to a very different role. I mean, you have to look at what the practice in the banking area is, what the expert testimony was, what the contract as a whole was. And I just think it envisioned something more than what was agreed with here. We have to give some credit to what Judge Childs did in a six-day bench trial and not just, I don't want to just toss it out the window because I think she got an overall impression of what these two parties were about. That's just, I've listened carefully to the argument and that's just my thought about it. And you've already explained why you don't accept that view of it. But that's fine. Okay. A response? Yes, you may have a response. Your Honor, you talk about how you have to look to the industry practice. I don't agree because to get to the industry practice, that's a stringent evidence. And under Delaware law, you can't get there unless there's an ambiguity. And the district court did not find an ambiguity. How many times have we been over that a lot? And it just seems to me that Judge Childs was saying, we're looking at the industry practice and I don't see the terms of this contract deviating so dramatically that I've got to depart this dramatically from what is an accepted and widely prevalent industry practice. But I know your view of it is that the extrinsic evidence was impermissible, although I have a question as to whether you even objected to the extrinsic evidence and whether you didn't offer testimony yourself on what the industry practice was. You want to respond to that too, don't you? I would, but, Your Honor, I certainly would defer to you if you would have me not. All right. I'm going to let you respond to it. Go ahead. One, you referenced deference to the district court. I don't believe the court owes deference because these are legal conclusions that the court found, not factual findings. All of the things we objected to are in the legal conclusions section. They're not factual findings to which this court owes. I know that, but what I'm saying to you is I don't think that this, the reading you propose of this contract, I'm not sure it's a slam dunk. And I'm not sure it is so crystal clear that it made what Judge Childs did impermissible. I'm a big believer in interpreting contracts the way they're written. But here there's enough ambiguity and question about the relevant roles of Section 2 and Section 8 and how they work together. And so she wanted to inform herself. I don't see anything that's impermissible about the way the district court proceeded. The industry practice seems to me to be irrelevant, unless there's some very clear reason to believe that this contract deviated. I'm just not sure I see that. A very helpful argument that you and Judge, the helpful exchanges that have gone on between you and your opponent and everything. I just wanted to give you a sense of why I think the district court, in the course of a six-day bench trial, did not proceed in any kind of impermissible manner. I see my time is far over.  Okay. Your Honor, there was some indication that the court believed that we offer testimony on this same issue. I disagree with that. Actually, the opposing counsel objected to our liability expert on the tort claims and said that he only gets to testify on the tort claims. And so we did not offer this industry standard testimony because it's a plain and ambiguous contract. And we're dealing with Delaware contract law. That was another thing that the parties chose here. They chose Delaware contract law. Delaware contract law says that you're stuck with the plain meaning, no extrinsic evidence. Delaware contract law that says when you include a full integration provision, like Section 16, you don't get to bring in extrinsic evidence. That was the decision that the parties made. You can't use extrinsic evidence. That's what that merger clause means. And there is Delaware Supreme Court case law on this point that says, when you have sophisticated parties who put a full integration provision in, then you can't go. I know that kind of assumes the conclusion about what the contract says. But anyway, this is, we've had a good discussion. We've given you a good deal of extra time. I want to thank you, Mr. Callaway, and you, Mr. Krause, for a very edifying argument. And I want to say, you know, my views, such as they are, I'm not speaking for the panel. I'm only saying an impression that I got. Thank you, Your Honor. Thanks to you both, and we will adjourn court. This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Albert Diaz, Henry F. Floyd